OPINION
{¶ l} Appellant, Michael D. Brown, Jr. ("Brown"), appeals the conviction and sentence for resisting arrest entered by the Willoughby Municipal Court. On review, we reverse the judgment of the Willoughby Municipal Court.
 {¶ 2} On August 8, 2005, at about 8:30 p.m., Security Officer Stephanie Daniel ("Daniel") responded to a disturbance at the Brown apartment in the Winchester Apartments in Willoughby Hills, Ohio.
 {¶ 3} When Daniel reached the Brown apartment, she observed a heated argument between Brown and his mother, Kimberly Brown. Daniel called the Willoughby Hills Police Department for assistance.
 {¶ 4} Three police officers from the Willoughby Hills Police Department arrived at the Brown apartment. They were Sergeant Planisek, Officer Mino, and Officer Anderson.
 {¶ 5} Upon arrival, Daniel advised Sergeant Planisek in the hall outside the apartment about the events witnessed by Daniel prior to the officers' arrival. At the same time, Officers Mino and Anderson entered the interior of the apartment to further investigate the disturbance.
 {¶ 6} Once inside the apartment, Officer Mino approached Brown and Officer Anderson approached Kimberly Brown. Officer Mino made three separate attempts to question Brown as to his identity and the events between him and his mother. Brown remained non-responsive to the officer's questions. Officer Mino then decided to arrest Brown for disorderly conduct and attempted to place handcuffs on Brown. A scuffle ensued between Brown and Officers Mino and Anderson. Brown was eventually subdued, placed under arrest, and transported to the Willoughby Hills Police Department, where he was charged with disorderly conduct and resisting arrest. The disorderly conduct charge was charged as a violation of R.C. 2917.11(A)(3), a misdemeanor of the fourth degree; and the resisting arrest charge was charged as a violation of R.C. 2921.33(A), a misdemeanor of the second degree.
 {¶ 7} Brown entered pleas of not guilty to both charges and the matter proceeded to a jury trial. The jury returned a verdict of not guilty to the disorderly conduct charge, and a verdict of guilty to resisting arrest.
 {¶ 8} On March 7, 2006, the trial court imposed the following sentence: 90 days in jail, 45 days of which was suspended, a fine of $500, $250 of which was suspended, costs, and one year of probation. The trial court stayed execution of the sentence pending appeal.
 {¶ 9} Brown has pursued his appeal to this court, asserting the following four assignments of error:
 {¶ l0} "[1.] The trial court erred when it failed to grant the defendant's [Crim.] Rule 29 motion for judgment of acquittal with regard to the resisting arrest charge.
 {¶ 11} "[2.] The trial court erred when it allowed the prosecutor to impeach a defense witness by the improper use of [Evid.R. 404(B)] evidence, although there was no basis for the prosecutor to inquire as to alleged crimes committed by the defendant.
 {¶ l2} "[3.] The trial court erred when it denied the defendant's motion for a mistrial when the prosecutor had engaged in prosecutorial misconduct by asking a defense witness if she knew about an assault on a police officer charge against the defendant.
 {¶ 13} "[4.] The trial court erred when it allowed the prosecutor to ask a defense witness, over defense objection, if the state's witness was honest, which is an issue solely in the province of the jury."
 {¶ 14} In his first assignment of error, Brown argues that the trial court erred by failing to grant his motion for acquittal pursuant to Crim.R. 29(A). Brown made his motion for acquittal at the conclusion of the prosecution's case and, again, at the conclusion of all the testimony.
 {¶ l5} "Crim.R. 29(A) provides that the trial court shall enter a judgment of acquittal `if the evidence is insufficient to sustain a conviction of such offense or offenses.' Thus, `the test an appellate court must apply when reviewing a challenge based on a denial of a motion for acquittal is the same as in reviewing a challenge based upon on the sufficiency of the evidence to support a conviction.'"[1]
 {¶ l6} Thus, this assignment of error requires a sufficiency of the evidence analysis.
 {¶ l7} "In reviewing a sufficiency of the evidence claim, the relevant inquiry is whether any rational fact finder, viewing the evidence in a light most favorable to the state, could have found all the essential elements of the crime proven beyond a reasonable doubt. * * * `On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'"[2]
 {¶ 18} In this court, Brown is arguing that his conviction for resisting arrest cannot be sustained where his arrest for disorderly conduct was unlawful, and cites this court's opinion in State v.Newsome in support thereof.[3] While we ratify our decision in theNewsome case, we do not agree that Brown's arrest was unlawful.
 {¶ 19} In addition, even though Brown was acquitted of disorderly conduct and convicted of resisting arrest, the lawfulness of Brown's arrest is tested under a probable cause standard instead of a beyond a reasonable doubt standard. As this court has stated:
 {¶ 20} "[T]he state need not prove that the defendant was guilty of the offense for which the arrest is made to uphold a subsequent conviction for resisting arrest. The arresting officer must only have probable cause to believe that the defendant's conduct, for which the arrest is being made, amounted to an offense."[4] Thus, if the Willoughby Hills police officers had probable cause to arrest Brown for disorderly conduct, his arrest for disorderly conduct was lawful.
 {¶ 21} "Probable cause for a warrantless arrest exists when the arresting officer has within his knowledge facts and circumstances that amount to reasonable and trustworthy information sufficient to warrant a prudent man in believing that a crime or offense had been or is being committed and that the person to be arrested is the probable offender."[5]
 {¶ 22} In determining whether probable cause exists, a reviewing court must analyze the totality of the circumstances and assess the relative weights of indicia of reliability.[6]
 {¶ 23} A discussion of the facts and circumstances at the time of Brown's arrest is in order to determine if there was probable cause for his arrest.
 {¶ 24} Four witnesses testified for the state of Ohio.
 {¶ 25} The first witness was Security Officer Daniel, who testified that Kimberly Brown called her on her cell phone on the night in question, because "[Kimberly Brown] didn't want her son there any longer." Daniel went to the Brown apartment and observed Brown banging on the outside of the apartment door. Daniel asked Kimberly Brown to open the door, at which time Brown entered the apartment, threw down some currency on the floor, and went to his bedroom. Daniel also entered the apartment at that time. Brown began to pack some clothes as if to leave, but then changed his mind and announced that he was not leaving. Yelling between Brown and Kimberly Brown ensued, and Brown began tossing pictures from a curio cabinet onto the dining room floor. Daniel testified that Kimberly Brown threatened to hit Brown, and Brown threatened to hit his mother. At that point, Daniel called for assistance from the Willoughby Hills Police Department. When the police arrived, Daniel advised Sergeant Planisek that the two parties were arguing over money and that they threatened to hit one another.
 {¶ 26} Next, Sergeant Planisek testified. He stated that when he arrived at the Brown apartment, he could hear the argument between mother and son from outside the apartment. He waited for the other two officers to arrive, at which time he knocked on the apartment door. He was greeted by Security Officer Daniel. He asked Daniel to brief him on the disturbance in the hallway. Daniel told him that Brown and his mother had been arguing over money. In the meantime, the other two officers entered the apartment. When Planisek and Daniel re-entered the apartment some minutes later, they observed that Brown was refusing to answer Officer Mino's questions and was being uncooperative, but that he was not verbally threatening anyone.
 {¶ 27} Next, Officer Anderson testified. He stated that he observed that Brown was being uncooperative and refusing to answer Officer Mino's questions and that he appeared to be angry. In Anderson's words, Brown was arrested for disorderly conduct "because of his demeanor and because of his actions and his lack of cooperation."
 {¶ 28} Finally, Officer Mino testified. He stated that he confronted Brown with a series of questions having to do with Brown's identity and the events that had transpired between him and his mother. Mino made at least three attempts to obtain information from Brown in the apartment. Each time Brown failed to respond, ignored the questions, and walked away from Mino. Eventually, Brown sat down on the couch in the living room. With Sergeant's Planisek's approval, Officer Mino placed Brown under arrest for disorderly conduct. As he did so, Brown resisted by trying to pull away from Mino's grasp, and, with the assistance of Officer Anderson, they were able to effect the arrest and escort Brown out of the apartment.
 {¶ 29} Brown argues in this court that Officer Mino should not have arrested Brown when Brown refused to answer his questions. That is, according to Brown, silence or refusal to answer questions cannot serve as a predicate for an arrest for disorderly conduct.
 {¶ 30} However, there were other facts and circumstances upon which Officer Mino could have relied in order to make the arrest for disorderly conduct. Specifically, there was the information that Security Officer Daniel shared with Sergeant Planisek that the parties were threatening to strike each other and Daniel's testimony that Brown was tossing articles around the apartment prior to the entry of the police officers. The statute prohibiting disorderly conduct, as charged in this case, states as follows:
 {¶ 31} "(A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
 {¶ 32} "* * *
 {¶ 33} "(3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response[.]"[7]
 {¶ 34} Just as in the case of a radio dispatch that justifies an investigatory stop, it is the collective knowledge of the law-enforcement officers that allows the arresting officer to rely upon those facts to effect an arrest.[8] Here, Officer Mino could rely upon more than Brown's non-responsive behavior and lack of cooperation to effect Brown's arrest. He could also rely upon the facts and circumstances known to Sergeant Planisek and Security Officer Daniel that Brown's actions were "insulting, taunting [and] challenging" to Kimberly Brown, and that they were likely to provoke a violent response. Therefore, there was sufficient evidence that Officer Mino had probable cause to arrest Brown and the arrest was lawful.
 {¶ 35} Brown's first assignment of error is without merit.
 {¶ 36} Brown's second, third, and fourth assignments of error relate to the testimony of Kimberly Brown, the mother of Brown, and shall be considered together.
 {¶ 37} Kimberly Brown was the only witness who testified in Brown's behalf.
 {¶ 38} On direct examination, Ms. Brown testified that she had a good relationship with her son, who was 19 years old at the time. At a very young age, she got him involved in a number of activities to channel his energy in a constructive way. At the time of the trial, he was enrolled in broadcasting school and taught tap-dancing part-time at a local day-care class. He had also performed in a number of music and theater productions. She did admit to having "situations" with her son while he was in school.
 {¶ 39} On cross-examination, she was asked by the prosecutor whether Brown had been involved in "criminal situations." Ms. Brown replied in the negative. Over objection, the trial court then permitted this line of questioning to continue, because Ms. Brown had "opened that door" and "[s]he raised the issue of character by saying [Brown] is a great kid." The prosecutor then asked Ms. Brown about an appearance in Bedford Municipal Court in 2004 with regard to a criminal charge against Brown. Ms. Brown replied that this appearance involved a traffic ticket. The colloquy with the prosecutor continued as follows:
 {¶ 40} "[Prosecutor:] Ms. Brown, other than that traffic ticket in Bedford Muni, are you aware of any other situations there?
 {¶ 41} "[Defense attorney:] Objection.
 {¶ 42} "[Trial court:] Overruled.
 {¶ 43} "[Ms. Brown:] No, I'm not aware."
 {¶ 44} Thereupon, Ms. Brown was again asked if she was aware of any other matters in Bedford Municipal Court. This time she responded that she was aware of an incident at Bedford Home Days in which a passenger in the vehicle in which Brown was riding flicked his middle finger at a patrol officer. The prosecutor then asked her if these were the only incidents that she could recall, to which she responded in the affirmative. The prosecutor then asked her:
 {¶ 45} "[Prosecutor:] There's no other that you can recall and you were in that court?
 {¶ 46} "[Ms. Brown:] No other.
 {¶ 47} "[Prosecutor:] Nothing about an assault on a police officer?
 {¶ 48} "[Defense attorney:] Objection.
 {¶ 49} "[Trial court:] Sustained.
 {¶ 50} "[Defense attorney:] Move to strike.
 {¶ 51} "[Trial court:] Hang on. The objection is sustained. The question will be stricken."
 {¶ 52} No document was offered by the prosecution or admitted into evidence to substantiate any of the events that may have occurred in Bedford Municipal Court.
 {¶ 53} Following the cross-examination of Ms. Brown, Brown's counsel moved for a mistrial. One of his grounds for a mistrial was the question asked of Ms. Brown concerning the charge of assaulting a police officer. Counsel for Brown argued that a charge of assaulting a police officer involves a felony and that such questioning was not permissible under the Ohio Rules of Evidence. Another ground was a question posed to Ms. Brown as to whether she had an opinion as to whether Security Officer Daniel was honest.
 {¶ 54} The trial court permitted inquiry regarding Brown's past run-ins with the law, because Kimberly Brown had "opened the door" and had "raised the issue of character by saying that [Brown] is a great kid."
 {¶ 55} Evid.R. 404(B) provides as follows:
 {¶ 56} "Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 57} Thus, evidence of other crimes having been committed is not admissible to prove bad character. It is only admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 58} Further, "Evid.R. 404(B) is to be strictly construed against the state."[9]
 {¶ 59} Evid.R. 404(A) (1 ) permits a defendant to offer evidence of a "pertinent trait of his character" in order to establish that he acted in conformity with his good character. In direct examination, Kimberly Brown testified about the laudable accomplishments of her son.
 {¶ 60} Evidence that Brown was a "great kid" is not evidence of a "pertinent trait of his character," but is more in the nature of general, good character. Evidence that Brown was easy-going or a peaceable person would have been more in the nature of a "pertinent trait of his character" that would tend to indicate that Brown would not engage in disorderly conduct.
 {¶ 61} Even though Brown's evidence regarding his general, good character was not evidence of a "pertinent trait" of his character in accordance with Evid.R. 404(A)(1), it was not challenged by the prosecutor. However, such evidence did not allow the prosecutor on cross-examination of Kimberly Brown to then introduce evidence of Brown's bad character by asking about "criminal situations" where the prosecutor was not attempting to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecutor made no showing that he was trying to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident through his questioning of Kimberly Brown. Moreover, Brown did object to the prosecutor's questions when he started asking Kimberly Brown about "criminal situations" that Brown may have been involved in.
 {¶ 62} There is nothing in the testimony that was elicited from Kimberly Brown regarding past "criminal situations" that would prove that Brown was likely to be disorderly on August 5, 2005. Only when "other acts" evidence tends to prove the guilt of the offense in question is such testimony admissible.[10] Therefore, the trial court erroneously permitted this line of questioning to continue.
 {¶ 63} Even if we were to consider such evidence that Brown is a "great kid" to be evidence of a "pertinent trait of his character," under Evid.R. 404(A)(1) the prosecutor is only permitted to introduce evidence to "rebut the same." The ability to rebut evidence of a "pertinent trait of his character" under Evid.R. 404(A)(1) does not give the prosecutor license to introduce evidence of other crimes having been committed by Brown pursuant to Evid.R. 404(B). In other words, even if Kimberly Brown's testimony established a "pertinent trait" of Brown's character, the prosecutor was not permitted to introduce evidence of bad character by proving that Brown had committed other crimes unless he was also prepared to show that the other crimes proved evidence of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. As stated above, the prosecutor made no such showing, nor did the evidence establish motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 64} Thus, the questioning of Kimberly Brown, wherein she was asked about other crimes committed by Brown, was not permissible either under Evid.R. 404, because it was offered to prove Brown's bad character and not to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 65} We shall now address whether the trial court should have granted a mistrial in light of the objectionable questioning of Kimberly Brown.
 {¶ 66} This court has previously stated that:
 {¶ 67} "The granting or denying of a mistrial under Crim.R. 33 rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. * * * An abuse of discretion `connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'"[11]
 {¶ 68} Further, "[m]istrials need be declared only when the ends of justice so require and a fair trial is no longer possible."[12]
 {¶ 69} In the instant case, the cumulative effect of the prosecutor's questions of Kimberly Brown on the subject of other crimes having been committed by Brown deprived Brown of a fair trial.
 {¶ 70} "Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial."[13]
 {¶ 71} The prosecutor's persistent questioning of Kimberly Brown about other crimes committed by Brown, including asking her about an assault on a police officer charge after being told three separate times that she could not recall other "criminal situations" in Bedford Municipal Court, clearly deprived Brown of a fair trial. Evidence introduced pursuant to Evid.R. 404(B) is to be strictly construed against the state and is admissible only if it tends to show that the defendant is likely to have committed the crime in question. The evidence of other crimes that the prosecutor introduced, none of which was substantiated by documents establishing that other crimes were committed, was offered to demonstrate Brown's bad character and not to prove that he committed the instant offense. The error should have been rectified by granting Brown's motion for a mistrial.
 {¶ 72} Thus, the second and third assignments of error have merit. As for the fourth assignment of error, relating to an improper question of Kimberly Brown on the subject of Daniel's honesty, suffice it to say that Evid.R. 608 provides that the credibility of another witness may be attacked or supported in the form of opinion evidence, but only after the character of the other witness for truthfulness has been attacked, which did not happen here. Moreover, in light of the fact that we are reversing Brown's conviction on the basis of the second and third assignments of error, the fourth assignment of error is moot.[14]
 {¶ 73} The judgment of the trial court is reversed, and the matter is remanded to the trial court for a new trial on the resisting arrest charge.
CYNTHIA WESTCOTT RICE, J., COLLEEN MARY OTOOLE, J., concur.
[1] State v. Smith, 6th Dist. No. E-05-090, 2006-Ohio-5101, at ¶ 9, quoting State v. Thompson (1998), 127 Ohio App.3d 511, 525.
[2] (Internal citations omitted.) Id. at ¶ 11, quoting State v.Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring).
[3] State v. Newsome, 11th Dist. No. 2003-A-0076, 2005-Ohio-3775, at ¶ 12.
[4] (Citations omitted.) State v. Wooden, 11th Dist. No. 2003-P-0035, 2004-Ohio-5514, at ¶ 32.
[5] State v. Kobi (1997), 122 Ohio App.3d 160, 169, citing Beck v.Ohio (1964), 379 U.S. 89.
[6] State v. Farndon (1984), 22 Ohio App.3d 31, 36.
[7] R.C. 2917.11(A)(3).
[8] State v. Cook (1992), 65 Ohio St.3d 516, 521.
[9] State v. Poling, 11th Dist. No. 2004-P-0044, 2006-Ohio-1008, at ¶ 22, citing State v. DeMarco (1987), 31 Ohio St.3d 191, 194.
[10] State v. DeMarco, 31 Ohio St.3d at 194.
[11] (Internal citation omitted.) State v. Albanese, 11th Dist. No. 2005-P-0054, 2006-Ohio-4819, at ¶ 22, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157.
[12] State v. Franklin (1991), 62 Ohio St.3d 118, 127.
[13] State v. DeMarco, supra, at paragraph two of the syllabus.
[14] App.R. 12(A)(1)(c).